IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KAREN MELOTT, | : | |
| Plaintiff, | : | Case No. 2:05-CV-063 |
| v. | : | Judge Holschuh |
| ACC OPERATIONS, INC., | : | Magistrate Judge King |
| Defendant. | : | |
| | : | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Karen Melott sued her former employer, Defendant ACC Operations, Inc. ("ACC"), asserting claims of breach of contract, promissory estoppel, and tortious interference with a business relationship. This Court's jurisdiction is based on diversity of citizenship. See 28 U.S.C. § 1332. This matter is currently before the Court on Defendant ACC's motion for summary judgment. (Record at 23). For the reasons set forth below, the Court grants that motion.

**I.      Background and Procedural History**

This case involves a conflict between Plaintiff Karen Melott and her former employer, Defendant ACC Operations, Inc. ("ACC"). The facts are essentially undisputed. In July 1996, Melott began working for Frontier Vision, a cable operator, as a Customer Service Representative in Chillicothe, Ohio. (Melott Dep. at 7-8; Melott Aff. at ¶ 1). ACC acquired Frontier Vision in 1997 and the Chillicothe Call Center became an ACC facility. (Melott Dep. at 7-8; Melott Aff. at ¶ 1). ACC is a wholly-owned subsidiary of Adelphia Communications Company ("Adelphia"). (Trippe Aff. at ¶ 2). ACC provides employees to Adelphia entities and

handles all human relations functions for the personnel who staff Adelphia entities like the Chillicothe Call Center. (Id. at ¶ 3).

In 1997, Melott was promoted to the position of Lead Customer Service Representative. (Melott Dep. at 8; Melott Aff. at ¶ 2). In 2002, ACC promoted Melott to the position of Customer Service Representative Supervisor. (Melott Dep. at 8-9; Melott Aff. at ¶ 2). As a Supervisor, Melott was responsible for a team of 15 employees. (Melott Dep. at 9-10; Melott Aff. at ¶ 2). Melott received an employee handbook in 2001 and signed an "Acknowledgment" form, stating she understood that her employment with Adelphia was at-will (Melott Dep. at 16-17), and that this at-will employment relationship could be changed only by a written agreement, signed by Adelphia's Chief Executive Officer, setting forth a specific term of employment. Melott agreed to abide by the policies in the handbook. (Id. at 19-20).

In July 2003, Melott approached Steve Trippe, the Operations Manager of the Chillicothe facility, Brenda Holdren, the Call Center Manager and Melott's direct supervisor, and Gerald Jordan, the Call Center Director, to discuss Melott's desire to transfer to another facility. (Melott Dep. at 59-60; Melott Aff. at ¶ 6). Melott explained to them that her husband was physically abusive. (Melott Dep. at 62). Because Melott feared for her own safety and that of her children, she wanted to move to a location unknown to her husband. (Id. at 61; Melott Aff. at ¶ 4). Trippe suggested that Melott search the Internet for available positions at other Adelphia facilities. (Melott Dep. at 65). Melott discovered an opening at Adelphia's facility in West Palm Beach, Florida. (Id. at 65-66; Melott Aff. at ¶ 7). Melott called the facility and spoke to Judy Blackstone, a Human Resources Manager. (Melott Dep. at 67; Melott Aff. at ¶ 7). During this phone call, Blackstone offered Melott a position as a Customer Service Representative. (Melott

Dep. at 66; Melott Aff. at ¶ 7). They agreed on an hourly wage (Melott Dep. at 67; Melott Aff. at ¶7) and set as Melott's start date September 26, 2003 (Melott Dep. at 68). After her telephone conversation with Blackstone, Melott had a conference with Trippe, Holdren, and Jordan and informed them that she had accepted a position in West Palm Beach. (Id. at 66, 69; Melott Aff. at ¶ 8). During this conference, Trippe and Jordan agreed to help Melott in "any way" they could. (Melott Dep. at 108-09; Melott Aff. at ¶ 6). The three managers agreed to keep the transfer confidential. (Melott Dep. at 70).

Melott originally intended to leave Chillicothe in September of 2003 (Melott Aff. at ¶ 9) and use her accrued paid leave while she relocated to Florida (Melott Dep. at 51; Melott Aff. at ¶ 8). However, when the threats of violence escalated at home, Melott left for Florida on August 12, 2003. (Melott Dep. at 70; Melott Aff. at ¶ 9). Melott called in each day she was scheduled to work, informing the Call Center that she would not be working that day. (Melott Dep. at 72-73; Melott Aff. at ¶ 10). When she called, Melott did not speak to Trippe, Holdren, or Jordan (Melott Dep. at 114; Melott Aff. at ¶ 10). Melott did not file a request for personal leave. (Melott Dep. at 33-36, 74).

In early September, an ACC payroll employee told Melott that she had exhausted her paid leave.[1] (Id. at 55, 120). Nevertheless, Melott did not return to work but continued calling in each day. (Id. at 118). On September 11, 2003, ACC's Chillicothe facility discharged Melott from employment because of her continued absences from work. (Id. at 79). Blackstone then notified Melott that because ACC had terminated her, she was ineligible for hire at the West

---

[1] Melott was told that she could not use the paid leave that had accrued while she worked for Frontier Vision unless she had a medical illness confirmed by a doctor. (Melott Dep. at 53-54; Melott Aff. at ¶ 8).

3

Palm Beach facility. (Id. at 79, 133; Melott Aff. at ¶ 12).

On January 20, 2005, Melott sued ACC. On April 1, 2005, ACC filed a motion to dismiss. Because Melott attached documents outside the pleadings to her memorandum in opposition, the Court notified the parties that it intended to convert the motion into a motion for summary judgment. Fed. R. Civ. P. 12(b)(6). ACC later withdrew its motion to dismiss, and Melott filed an amended complaint, asserting claims of breach of contract, promissory estoppel, and tortious interference with a business relationship. (Amd. Compl. at ¶¶ 18, 20, 22). Melott argues that the managers broke their promises to assist her in transferring to another facility and that ACC wrongfully terminated her employment with the company. (Amd. Compl. at ¶¶ 15-17). ACC has moved for summary judgment on all claims.

**II.     Standard for Granting Summary Judgment**

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also

Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the

5

parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving party must demonstrate that "there is a genuine issue for trial" and "cannot rest on her pleadings."  Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court, however, may enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at

251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

**III.   Discussion**

Melott's amended complaint contains three causes of action: (1) breach of contract; (2) promissory estoppel; and (3) tortious interference with a business relationship.  First, the Court will discuss Melott's claims of breach of contract and promissory estoppel, both exceptions to the employment-at-will doctrine.  Second, the Court will address the claim of tortious interference with a business relationship.

**A.   Exceptions to the Employment-at-Will Doctrine**

Under Ohio law, there is "a strong presumption in favor of a contract terminable at will." Mers v. Dispatch Printing Co., 19 Ohio St. 3d 100, 102, 483 N.E.2d 150, 153 (1985).  The employment-at-will doctrine holds that "[u]nless otherwise agreed, either party . . . may terminate the employment relationship for any reason which is not contrary to law." Id. at 103, 483 N.E.2d at 153.  Melott admits that she was an at-will employee. (Melott Dep. at 15). However, she asserts two exceptions to the employee-at-will doctrine: the existence of an implied contract and promissory estoppel.  The first exception applies if an at-will employee establishes the existence of an agreement that alters the terms of discharge.  Mers, 19 Ohio St. 3d at 103, 483 N.E.2d at 154.  The second exception limits an employer's right to discharge an at-will employee if the employer makes a promise that the employer reasonably should expect to induce action or forbearance on the part of the employee. Id. at 104, 483 N.E.2d at 154.

**1.   Breach of Contract**

Melott asserts that ACC breached its contractual obligations by wrongfully terminating her employment with the company.  It is undisputed that there is no express written contract that

alters Melott's status as an at-will employee. (Melott Dep. at 20-21). The question is whether the parties intended and were bound by an implied contract that altered the terms of discharge.

To prevail on a breach of contract claim under Ohio law, Melott must show: (1) the existence of a binding contract, (2) performance by Melott, (3) breach by ACC, and (4) damage to Melott as a result of ACC's breach. Samadder v. DMF of Ohio, Inc., 154 Ohio App. 3d 770, 778, 798 N.E.2d 1141, 1147 (2003). To establish the existence of an implied contract, an at-will employee must prove each element necessary to form a contract. Daup v. Tower Cellular, Inc., 136 Ohio App. 3d 555, 561, 737 N.E.2d 128, 133 (2000). A plaintiff must show mutual assent (i.e., offer and acceptance) and consideration. Nilavar v. Osborn, 127 Ohio App. 3d 1, 11, 711 N.E.2d 726, 732 (1998). The parties must have a meeting of the minds to limit the terms of discharge, Schwartz v. Comcorp, Inc., 91 Ohio App. 3d 639, 647, 633 N.E.2d 551, 556 (1993), and the contract must be definite as to its essential terms, Nilavar, 127 Ohio App. 3d at 11, 711 N.E.2d at 732.

A binding agreement can be implied by the facts and circumstances surrounding the employment relationship, including, in some situations, oral representations made by supervisory personnel. Wright v. Honda of Am. Mfg., Inc., 73 Ohio St. 3d 571, 574-75, 653 N.E.2d 381, 384 (1995). However, courts have found repeatedly that vague statements promising job security are insufficient to overcome the presumption of at-will employment. Srail v. RJF Int'l Corp., 126 Ohio App. 3d 689, 710, 11 N.E.2d 264, 278 (1998) (chairman's general assurances of job security and promises for advancement did not create an implied contract for continued employment, because "[t]here was no statement of employment for a definite term" or "evidence of any mutual intent to bind the parties to continued employment"); Daup, 136 Ohio App. 3d at

561, 737 N.E.2d at 133 (manager's statements that the employee was going to be the manager's right-hand man for a long time and that the two were going to have many ventures together were insufficient to establish an implied contract for continued employment); Anders v. Speciality Chem. Res., Inc., 121 Ohio App. 3d 348, 351, 700 N.E.2d 39, 41-42 (1997) (employer's statements ensuring the employee a "secure future" and a "secure career" and assuring him that he could be terminated only for inadequate performance were insufficient to establish an implied contract); Condon v. Body, Vickers & Daniels, 99 Ohio App. 3d 12, 19, 649 N.E.2d 1259, 1263-64 (1994) (employer's statements that the firm was looking for an associate to participate in a five-year training program and that the associate had a job as long as he did not "use" the firm were insufficient to establish an implied contract that altered the employee's at-will status); Clipson v. Schlessman, 89 Ohio App. 3d 230, 233, 624 N.E.2d 220, 222 (1993) (employer's statements that the employee was in a good position with the company and that the employee would never have to worry about his job were not promises of employment).

In this case, Melott bases her breach of implied contract claim on the ACC managers' assurance that they would help her to transfer to West Palm Beach in "any way" they could. (Melott Dep. at 108-09).  Melott argues that this offer of assistance created an implied contract that altered her status as an at-will employee and guaranteed her employment until she began working at the facility in West Palm Beach.  ACC contends summary judgment is appropriate because there is no genuine issue regarding the existence of a binding contract.  Based on the evidence presented, the Court agrees that no reasonable jury could find a binding contract existed that limited the conditions under which Melott could be discharged.

The managers' vague offer to assist Melott's transfer to West Palm Beach cannot be construed as an offer to enter into a binding contract to limit the terms of her discharge. The parties did not agree that ACC would continue to employ Melott for any particular length of time. There is no evidence that they agreed that Melott's job at the Chillicothe Call Center would remain secure, regardless of her attendance, until she started working in West Palm Beach. Melott contends that it was her understanding that her absences during the transition were approved. (Melott Dep. at 59). Melott did not believe she would be subject to discharge for her continued absences even after she was informed that she had exhausted her paid leave. (Melott Aff. at ¶ 8). However, regardless of Melott's subjective belief that the managers' vague offer to assist the transfer altered her status as an at-will employee and was broad enough to protect her from discharge for excessive absences, it is clear from the facts of this case that there was no meeting of the minds concerning the subject. It is undisputed that Melott did not seek the managers' approval prior to leaving her position at the Chillicothe Call Center earlier than anticipated, and the subject of unexcused absences was never discussed.

Moreover, the fact that the ACC facility in West Palm Beach set a start date for Melott and agreed to an hourly wage does not alter the general presumption that this continued to be an at-will employment relationship. Henkel v. Educ. Research Council of Am., 45 Ohio St. 2d 249, 254, 344 N.E.2d 118, 121 (1976) ("A hiring at so much a day, week, month, or year, no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even.").

Finally, there is no evidence that the managers' assurance that they would assist Melott's transfer was supported by any consideration on Melott's part. In short, the evidence is insufficient to create a genuine issue of material fact concerning whether there was a binding

contract that altered Melott's status as an at-will employee. Accordingly, ACC is entitled to summary judgment on Melott's claim of breach of contract.

### 2. Promissory Estoppel

Melott also seeks relief under a theory of promissory estoppel. To recover under this theory, Melott must show that: (1) ACC made a clear and unambiguous promise, (2) Melott relied on that promise, (3) her reliance was reasonable and foreseeable, and (4) she was injured as a result of her reliance. Weiper v. W.A. Hill & Assoc., 104 Ohio App. 3d 250, 260, 661 N.E.2d 796, 803 (1995). Melott alleges that the ACC managers promised to assist her transfer to another facility and that she reasonably and foreseeably relied to her detriment on that promise when she left Chillicothe in August to move to West Palm Beach. ACC contends summary judgment is appropriate because no reasonable jury could find that the ACC managers made a clear and unambiguous promise of job security, or that Melott reasonably and foreseeably relied on the managers' offer of assistance. After carefully reviewing the evidence presented, the Court agrees that ACC is entitled to summary judgment on the promissory estoppel claim.

In connection with the first element, Melott must point to a promise by ACC that can be interpreted as limiting ACC's ability to terminate her. Srail, 126 Ohio App. 3d at 709, 711 N.E.2d at 278. Melott has to prove that a "specific promise of job security" was made to her. Skalka v. Fernald Envtl. Restoration Mgmt. Corp., 178 F.3d 414, 424 (6th Cir. 1999). In addition, "specific promises of job security must be clear and unambiguous." Srail, 126 Ohio App. 3d at 709, 711 N.E.2d at 278. A clear and unambiguous promise specifically indicates the length of employment. Condon, 99 Ohio App. 3d at 20-21, 649 N.E.2d at 1264.

Based on the evidence presented, no reasonable jury could find that ACC made a clear and unambiguous promise of job security. The ACC managers' assurance that they would assist Melott's transfer to West Palm Beach in "any way" they could is ambiguous. More importantly, no reasonable jury could construe the statement as a promise that, regardless of her attendance, ACC would continue to employ Melott until she began working at the West Palm Beach facility. There is no evidence to support a finding that the managers' offer to help in "any way" with the transfer encompassed a promise to continue to employ Melott even though she failed to report to work and to supervise her team of 15 employees for one month. Wing v. Anchor Media, Ltd., 59 Ohio St. 3d 108, 110-11, 570 N.E.2d 1095, 1099 (1991), ("[A] promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the well-established doctrine of employment at will."); Daup, 136 Ohio App. 3d at 563, 737 N.E.2d at 134 ("[V]ague, indefinite promises of future employment or 'mere representations of future conduct without more specificity' do not form a valid basis for the application of the doctrine of promissory estoppel." (internal quotation marks omitted)); Reasoner v. Bill Woeste Chevrolet, Inc., 134 Ohio App. 3d 196, 202, 730 N.E.2d 992, 996 (1999) ("[G]eneralized references to the future are not sufficient to overcome the strong presumption of at-will employment."); Irwin v. Marquette Med. Sys., Inc., 107 F. Supp. 2d 974, 991 (S.D. Ohio 2000) (rejecting a claim of promissory estoppel because a company e-mail stating that a reorganization plan would not result in a loss of jobs "did not provide Plaintiff with a specific promise that his job would continue for any certain length of time").

Moreover, while Melott may have interpreted the managers' general offer to assist with her transfer to mean she would not be discharged for unexcused absences, her subjective

12

understanding, not based on a concrete promise, was unreasonable. In the Court's view, it is insufficient to create an inference of continued employment. Weiper, 104 Ohio App. at 258, 661 N.E.2d at 801-02 ("[The plaintiff] testified that it was his 'understanding' . . . that commissions were to continue postemployment, but he could not identify any specific oral promise . . . to that effect."). Therefore, because Melott cannot show a specific promise of continued employment, she cannot establish the first element of a promissory estoppel claim.

Furthermore, no reasonable jury could find that Melott reasonably and foreseeably relied on the managers' offer of assistance when she abandoned her job in Chillicothe earlier than she anticipated and failed to report to work after she had exhausted her paid leave. An employee's reliance is reasonable if the employer should have expected the employee to base her actions or forbearance on the employer's promise. Srail, 126 Ohio App. 3d at 709, 711 N.E.2d at 278.

There are at least two reasons why Melott's reliance was not reasonable in this case. First, Melott signed an "Acknowledgment" form, indicating that she understood she was an at-will employee and that this status could be changed only by a written agreement, signed by Adelphia's Chief Executive Officer, setting forth a specific term of employment. Melott had no such agreement; thus, Melott knew or should have known that despite the managers' offer to assist her transfer to West Palm Beach, she could be terminated at any time. Second, without evidence of a specific promise of job security, Melott was not justified in relying on the managers' offer of assistance. Penwell v. Amherst Hosp., 84 Ohio App. 3d 16, 20, 616 N.E.2d 254, 257 (1992) (absent a specific promise, an employee is "hard pressed to demonstrate that he was justified in detrimentally relying on the employer's representations").

In addition, neither Melott nor her managers anticipated that she would be leaving in mid-August or that she would exhaust her paid leave before she began working in West Palm Beach. Therefore, no one could have anticipated that Melott would rely to her detriment on the managers' offer to help in "any way" with the transfer. Irwin, 107 F. Supp. 2d at 991 (finding the company could not have anticipated that the employees would rely to their detriment on the statement that the reorganization of the company would not result in a loss of jobs).

Accordingly, because Melott has failed to present sufficient evidence of a clear and unambiguous promise of job security and reasonable and foreseeable reliance on that alleged promise, elements on which she bears the burden of proof, ACC is entitled to summary judgment on the promissory estoppel claim.

### B. Tortious Interference with a Business Relationship

Melott also asserts a claim of tortious interference with a business relationship. A claim for tortious interference with a business relationship exists when "one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another." Juhasz v. Quik Shops, Inc., 55 Ohio App. 2d 51, 57, 379 N.E.2d 235, 238 (1977). In this case, Melott contends that ACC's Chillicothe facility interfered with her prospective employment at ACC's West Palm Beach facility when it discharged her and informed the West Palm Beach facility of her termination.

To establish tortious interference with a business relationship under Ohio law, Melott must prove: (1) a business relationship with a third party, (2) ACC's knowledge of the business relationship, (3) ACC's intentional interference with the relationship, causing a breach or termination of the relationship, and (4) damages to Melott resulting from ACC's interference

with the relationship. Wolf v. McCullough-Hyde Mem'l Hosp., 67 Ohio App. 3d 349, 355, 586 N.E.2d 1204, 1208 (1990).

ACC argues summary judgment is appropriate because the undisputed facts show no interference with any business relationship between Melott and a third party. Because ACC operates both the Chillicothe and the West Palm Beach call centers (Trippe Aff. at ¶ 4), there is no "third party" with which to interfere. Melott has not put forth any evidence in response to ACC's motion for summary judgment on this claim. Because no reasonable jury could find that Melott had a business relationship with a third party, ACC is entitled to summary judgment on this claim.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** ACC's motion for summary judgment. (Record at 23). The Clerk is directed to enter judgment in favor of Defendant ACC.

**IT IS SO ORDERED.**


Date: July 10, 2006                          **/s/ John D. Holschuh**
                                             John D. Holschuh, Judge
                                             United States District Court